IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAURA LASICH,

      Plaintiff,                      No. CIV S-04-1346 GGH

    vs.

JO ANNE B. BARNHART,
Commissioner of
Social Security,

      Defendant.                  <u>ORDER</u>

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons that follow, the court denies plaintiff's Motion for Summary Judgment or Remand, and grants the Commissioner's Cross Motion for Summary Judgment. The Clerk is directed to enter judgment for the Commissioner.

\\\\\

\\\\\

\\\\\

\\\\\

1

BACKGROUND

Plaintiff, born August 8, 1961, applied for disability benefits on May 31, 2001.[1] (Tr. at 76.) Plaintiff alleged she was unable to work since December, 2001,[2] due to a crushed pelvis, severed legs, right leg crushed with five prior surgeries, ovarian cancer,[3] migraine headaches, chronic low back pain, swelling of abdomen, Hepatitis C, and Epstein-Barr Virus ("EBV"). (Id., 497.) In a decision dated December 16, 2003, ALJ Robert K. Rogers, Jr., determined that plaintiff was not disabled.[4] The ALJ made the following findings:

---

[1] Another application was filed on August 1, 2000, but after it was denied, plaintiff did not appeal. (Tr. at 14.)

[2] At the administrative hearing, this date was amended from a previous March, 1984 date. (Tr. at 14.)

[3] Plaintiff was in a motorcycle accident in 1984 where she fractured her pelvis and her left knee. (Tr. at 358.) Plaintiff's legs were not severed and her bones were not crushed. She was in another car accident in 2000 where she sustained only multiple contusions. (Tr. at 142.) Plaintiff did not have ovarian cancer, but did undergo a total hysterectomy due to endometriosis.

[4] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

>Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

1. The claimant has not engaged in substantial gainful activity since the alleged disability onset date of December 16, 2001 as amended.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6. The claimant retains the residual functional capacity for the full range of sedentary work.

7. The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

8. The claimant is a "younger individual" (20 CFR § 416.963).

9. The claimant has a "high school education" (20 CFR § 416.964).

10. Transferability of skills is not an issue material to this decision (20 CFR § 416.968).

11. Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, the claimant is able to make a successful adjustment to work that exists in significant numbers in the national economy; a finding of "not disabled" is therefore reached by direct application of Medical-Vocational Rules 201.27, 201.28 and 201.29, Appendix 2, Subpart P, Regulations No. 4.

\\\\\

---

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

3

      12.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

(Tr. at 23-24.)

## ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Erred in Failing to Find Plaintiff's Mental Impairment Was a Severe Impairment; B. Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility; C. Whether the ALJ Erred in Finding that Plaintiff had the Residual Functional Capacity to Perform the Full Range of Sedentary Work; and D. Whether the ALJ Erred in Rejecting the Opinion of treating sources Dr. Kusic and nurse practitioner Raibley.

## LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

\\\\\
\\\\\
\\\\\

ANALYSIS

A. Whether the ALJ Erred in Failing to Find Plaintiff's Mental Impairment Was a Severe Impairment

Plaintiff first contends that in considering plaintiff's impairments at step two, the ALJ should have found that plaintiff's depression and anxiety were severe impairments.

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered." SSR 85-28. The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987). "The step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).

The ALJ only found plaintiff's Hepatitis C, Epstein Barr Virus, chronic migraine headaches, endometriosis and chronic cholecystitis, status post total abdominal hysterectomy, bilateral oopherectomy and laparoscopic cholecystectomy, degenerative arthritis of the left knee, and degenerative disc disease of the lumbar spine to be severe. The ALJ did not find plaintiff's mental impairments to be severe because the record did not reflect any significant psychiatric or psychological findings consistent with a severe impairment. (Tr. at 16.) Further, the ALJ noted that plaintiff had not sought regular counseling or therapy since her onset date, and did not obtain therapy from a licensed psychologist or board certified psychiatrist. (Id.)

The records covering this impairment include a monthly treatment report by Tehama County CalWorks. Plaintiff's progress toward work readiness was described as poor due to physical health problems. (Tr. at 370.) Plaintiff's general mood and affect, judgment, decision making abilities, and stress level tolerance were fair, but her attendance, punctuality, appearance, behavior, attitude, speech and thought process, impulse control, and motivation were

1  good. (Id.)

2  A psychological assessment was performed by Dr. Koulianos on August 20, 2003
3  at the request of the California Department of Social Services. Based on a variety of tests, she
4  found plaintiff to be of average intelligence with low average scores on verbal reasoning. (Tr. at
5  410.) The results of the MMP1-2 exam indicated "mild levels of depression and moderate levels
6  of anxiety." (Id.) Dr. Koulianos stated that plaintiff tended to downplay her emotional
7  difficulties and presented a distorted image of herself due to her inability to tolerate any claim of
8  personal inadequacy. (Id.) Based on her defensiveness and underestimation of her emotional
9  difficulties, this psychologist recommended her scores be interpreted with this in mind. Plaintiff
10 was diagnosed with pain disorder, probable dysthymia, and chronic pain and fatigue. (Id.)
11 Nevertheless, Dr. Koulianos opined that plaintiff could execute simple one or two step
12 instructions, could interact with coworkers and supervisors, could undertake basic daily activity
13 routines, and could manage transitions or minor stressors of entry level jobs, all without
14 significant difficulty. (Id. at 411.)

15 Other than these reports, plaintiff does not appear to have sought separate
16 treatment for her mental problems, but her general nurse practitioner's records contains some
17 notes regarding her depression and anxiety. (Tr. at 383.) She was prescribed Elavil for
18 depression and Ativan for anxiety. (Id.) www.pdrhealth.com. See also Tr. at 310 (prescribed
19 Ativan for anxiety); 336 (advised to continue with antidepressant for depression); 338 (note to
20 obtain mental health evaluation for depression); 350 (Ativan for anxiety with follow-up planned);
21 384; 385 (anxiety).

22 Plaintiff has never been diagnosed with depression or anxiety by an acceptable
23 medical source. Even if nurse Raibley is considered an acceptable source; see discussion infra,
24 the ALJ was permitted to rely on the opinion of Dr. Koulianos. Although this psychologist
25 opined that plaintiff probably had depression, she did not give a definitive diagnosis. Further,
26 she described plaintiff's level of functioning which appears to be adequate for the workplace.

She did note that her visit with plaintiff was a brief one time exam and that it should be considered in conjunction with other documentation. (Tr. at 410.) Nurse practitioner Raibley's records (as signed off by Dr. Kusic) indicate diagnoses of depression and anxiety, and prescription medication over an almost two year time period. Nevertheless, if medication and treatment are able to control possible depression or anxiety, then the condition must be viewed in light of plaintiff's condition while taking the medications. An impairment which can be controlled in this manner does not qualify as a severe impairment. Treatments which for the most part eradicate severe symptoms must be analyzed.

> In Sutton, twin sisters with severe myopia contended they were discriminated against by an airline. Id. at 475-76, 119 S.Ct. 2139. The twins wore corrective lenses which gave them vision of 20/20 or better. Id. at 475, 119 S.Ct. 2139. The Supreme Court held that the twins were not disabled. Id. at 488-89, 119 S.Ct. 2139. The disability determination does not depend upon hypotheticals such as what the twins would face if they did not wear glasses. Id. at 482, 119 S.Ct. 2139. Instead, the disability determination "depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting." Id. at 488, 119 S.Ct. 2139. In Fraser's case, we consider both artificial mitigating measures, such as insulin injections and other drugs, as well as natural mitigating measures, such as the body's natural response to cope with physical impairments.

Fraser v. Goodale, 342 F.3d 1032, 1038-1039 (9th Cir. 2002), citing Sutton v. United Air Lines, 527 U.S. 471, 482, 119 S. Ct. 2139 (1999).

While Sutton and Fraser deal with the definition of disability under the Americans with Disabilities Act (somewhat analogous to the severe impairment concept in Social Security cases), there is no reason why the principles of those cases cannot be employed here. A Third Circuit Social Security case, which mirrors the above reasoning, is instructive to the medication issue apparent here:

> We conclude that the terms are not synonymous and that Schaudeck's disease was not "controlled by" her chemotherapy simply because it was "responding to" the treatment. We hold that "control," as used here, means that the treatment has been so

7

> successful that the disease can be considered effectively neutralized.

Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 432 (3rd Cir. 1999). Even though Schaudeck analyzed a different point on the sequential analysis than is at issue here, the principle is the same. If anxiety and depression are "effectively neutralized" through medication, they should not count as severe impairments.

There is no evidence that plaintiff could not control her mental problems with medication and therefore the court will assume she achieved efficacious relief from them. The court finds that plaintiff's mental impairments are not severe. Even if considered in combination with plaintiff's other impairments, the outcome is the same.

### B. Whether the ALJ's Credibility Finding Was Supported by Substantial Evidence

Plaintiff contends that the ALJ did not properly evaluate her credibility.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Id. at 345-46.[5] If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication,

---

[5] This does not mean, however, that the lack of objective evidence to support the pain alleged is irrelevant to the analysis.

8

treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[6] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

In this case, the ALJ found plaintiff only partially credible for a variety of reasons. He first noted plaintiff's complaints of pain were inconsistent with the substantial evidence of record. Despite diagnostic tests indicating degenerative disease in the left knee and lumbar spine, Hepatitis C and Epstein Barr viruses, plaintiff's range of motion has always been normal, as have her sensation, reflexes and motor functioning. (Tr. at 22.) The ALJ added that despite using a cane or crutches to walk, nurse practitioner Raibley has consistently found plaintiff's gait to be normal, with negative Romberg signs and negative straight leg raising tests. (Id.) Dr. Otani questioned whether plaintiff even needed a cane or knee brace. Further, the ALJ noted a lack of muscle atrophy or weakness, which was inconsistent with plaintiff's claimed need for frequent

---

[6] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

bedrest, fatigue and inactivity. (Id.) The ALJ also stated that on two occasions when plaintiff was distracted, she performed better on objective examination testing. Although not discussing the other factors, the ALJ specifically stated that he had considered plaintiff's daily activities, her symptoms, medication, treatment, and plaintiff's medical record and whether her impairment would be expected to produce the symptoms and their limiting effects as alleged by plaintiff.

Defendant also pointed out plaintiff's exaggeration of her impairments, including her description in her disability application of "severed leg," "crushed pelvis," and ovarian cancer. (Tr. at 76.) In fact, plaintiff's leg and pelvis were broken, but no limbs were severed. Plaintiff did not have cancer, but only endometriosis. (Tr. at 272, 399.)

The record supports the ALJ's findings in this regard. Dr. Otani, who conducted an orthopedic exam at the request of the Department of Social Services on September 2, 2001, thought plaintiff's credibility was a significant enough issue to discuss it at length:

> The patient's reliability as a historian appears to be suspect in that there is no focal neurologic findings nor evidence of radicular component with regard to her overall pain symptomatology on my examination. The patient does have inconsistencies in her examination which are nonphysiologic. Subjective complaints appear to be greater than objective findings. The patient does demonstrate an antalgic gait pattern with decreased weight bearing on the left leg. The patient denies ability to heel walk and toe walk, but is able to tandem walk. The patient is unable to squat. The patient is able to dress and undress, get up from a chair, get up on an exam table and is cooperative throughout the examination. Examination of the patient's left knee demonstrates no evidence of effusion nor ligamentous instability. It is questionable if the patient actually needs left hand single point cane nor the knee brace.

(Tr. at 290.)

Dr. Goyal, who conducted a thorough review of the medical records and examined plaintiff on August 23, 2003, opined that plaintiff walked with a cane, but could walk without one.[7] (Tr. at 401.) She had no problems sitting, getting on or off the examination table, or taking

---

[7] Later, the doctor explained that plaintiff should use the cane for uneven surfaces or long distances. (Tr. at 403.)

10

off her shoes. (Id.)  Furthermore, plaintiff resisted raising her legs, but in a sitting position, straight leg raising was negative. (Id. at 403.)  Dr. Goyal also noted that plaintiff could do a lumbar spine flexion in a very limited manner, but when distracted she could do it very well. (Tr. at 394.)

Dr. Dann also performed a consultative exam on November 29, 2001.  He concluded that plaintiff was only partially credible, that there was no evidence of gait imbalance, and that plaintiff did not need a cane or crutch. (Tr. at 329.)

After plaintiff was in a second motor vehicle accident on January 1, 2000, she saw Dr. Loeliger on June 21, 2000 for pain in her left knee.  This physician opined that there may be some element of drug seeking. (Tr. at 481.)

In regard to plaintiff's daily activities, her report to Dr. Goyal was that she could not do most activities, including cooking, yard work, housework, vacuuming, mopping, washing dishes, and grocery shopping. (Tr. at 400.)  According to plaintiff's report to Dr. Koulianos, she could take care of her personal hygiene, manage her own finances, and interact with friends and family. (Tr. at 408.)  She also reported to Dr. Bellomo that she folds laundry and loads the dishwasher. (Tr. at 468.)

Furthermore, plaintiff's own treating source, nurse Raibley, noted on numerous occasions that plaintiff exhibited normal gait, negative Romberg, and negative straight leg raises. (Tr. at 296, 297, 305, 307, 308, 310, 311, 312, 317.)   It is true that there are many objective signs of illness in plaintiff's records, radiological studies indicating marked disc narrowing at L5-S1, degenerative changes and scleroisis in the distal femur, Epstein-Barr virus and Hepatitis C by blood test, and psychological tests. (Tr. at 232, 478, 391, 407-410.)  Nevertheless, these records do not bear out the degree of pain alleged by plaintiff.  The ALJ did find plaintiff to be partially credible and the record supports this finding.  Based on the foregoing record evidence, substantial evidence supports the ALJ's credibility determination.

\\\\\

C.  Whether the ALJ Erred in Finding that Plaintiff had the Residual Functional Capacity to Perform the Full Range of Sedentary Work

Under this subheading, plaintiff makes the following contentions: (1) that the ALJ did not consider plaintiff's mental impairments in combination with her physical impairments and their effect on her ability to do the full range of sedentary work; (2) that the physicians relied on by the ALJ for the determination that plaintiff could do sedentary work did not consider her Epstein-Barr Virus; (3) that the ALJ overruled Dr. Goyal's determination that plaintiff could only lift less than ten pounds, choosing instead to find that plaintiff could lift up to ten pounds occasionally, as required by the sedentary work guidelines; and (4) that the ALJ improperly relied on the Medical-Vocational Guidelines to find plaintiff not disabled when he should have considered plaintiff's nonexertional limitations, her mental impairments, and fatigue as a result of Epstein-Barr virus.

"Sedentary work" is defined by 20 C.F.R. § 404.1567(a)(2005) as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. SSR 96-9p., 61 Fed. Reg. 34,478 (1996); SSR 83-10 (1983); Ferraris v. Heckler, 728 F.2d 582, 587 (2nd Cir. 1984) (upholding SSR 83-10). Social Security Rulings are final opinions and policy of the Social Security Administration, and as such are binding on ALJs. Paulson v. Bowen, 836 F.2d 1249, 1252 n. 2 (9th Cir.1988).

Plaintiff's first contention regarding her mental impairments was addressed in the first section *supra*. In regard to plaintiff's Epstein-Barr Virus, she claims that Drs. Grady, Otani

and Goyal did not offer opinions as to the effect of this virus on her functional capacity.[8]

Dr. Goyal completed an internal medical evaluation with a comprehensive review of medical records on August 23, 2003. His diagnosis was back pain with possible lumbar degenerative disc disease. There was back tenderness with some paraspinal muscle spasms. Migraine headaches were also diagnosed. (Tr. at 403.) In regard to plaintiff's functional limitation, Dr. Goyal found plaintiff could stand and walk less than two hours, but could sit for six hours in an eight hour day. She could carry less than ten pounds occasionally. She could squat, kneel, pivot, and perform all manipulative functions. (Id.) Plaintiff would need an assistive device only for uneven terrain or long distances. (Id.)

Dr. Otani performed an examination on or about September 2, 2001. This physician evaluated plaintiff's orthopedic problems and diagnosed left knee degenerative arthritis, total body pain, Hepatitis C, history of migraines, and total abdominal hysterectomy. (Tr. at 289-90.) He concluded that plaintiff could stand for twenty minutes at a time and a total of two hours in an eight hour day. She had no limitations in sitting and no physical limitations in the upper extremities. (Id. at 290.)

Dr. Grady examined plaintiff on May 9, 2001 for cholelithiasis. A cholecystectomy (surgical removal of the gallbladder) was performed. (Tr. at 273-75.)

Dr. Bellomo conducted a complete orthopedic evaluation with review of medical records on September 25, 2000. (Tr. at 467.) Exam indicated a significant instability in the left knee with crepitus and loss of muscle strength. (Id. at 470.) There was also lumbar tenderness without muscle spasm. (Id.) The diagnosis was chronic low back pain, chronic left hip, knee and ankle pain. He concluded that plaintiff could only stand and walk for less than two hours in a

---

[8] Plaintiff raises for the first time in her reply her Hepatatis C condition and its impact on her claim that the ALJ failed to consider that none of the physicians upon whom he relied weighed it regarding her functional capacity. Issues raised for the first time in a reply brief will not be considered. Socop-Gonzalez v. I.N.S., 272 F.3d 1176, 1185 (9th Cir. 2001). The Commissioner has had no opportunity to respond to this contention.

work day. She could sit for eight hours with appropriate breaks. She could carry less than ten pounds occasionally. She could bend and stoop, but could not squat, kneel or pivot. Contrary to defendant's representation, this physician opined that plaintiff would need to use an assistive device to get around short distances. (Id.)

Nurse Raibley's functional assessment concluded that plaintiff could stand and walk from not at all up to two hours in an eight hour day, and could only sit for a maximum of two hours a day. (Tr. at 376.) The explanation for the limited standing and walking time was that medications impaired her concentration and reflexes. There was no explanation given for the limitation on sitting. (Id.) EBV was not mentioned as a reason for any limitations. (Id. at 376-77.)

It is true that none of the physicians who gave an opinion as to plaintiff's functional capacity referred to her EBV, including the nurse practitioner upon whom plaintiff relies. On this issue, the ALJ found EBV was a severe impairment and stated that because it and the other severe impairments significantly limited plaintiff's ability to lift, sit, stand, and walk, they are severe. (Tr. at 16.) He stated that his determination that plaintiff could do sedentary work was based on these limitations. (Id. at 18.) He described the objective medical findings and in regard to EBV, he stated, "[l]aboratory reports also confirmed that the claimant was positive for both the Hepatitis C and Epstein Barr viruses, with a needle biopsy showing only minimal histolic change at Grade O, stage O (see Exhibits 11F and 25F)." (Id.) See Tr. at 383.

Plaintiff tested positive for EBV on December 3, 2001, and February 5, 2003; however, treatment records after both tests do not reflect treatment for this virus. (Tr. at 378, 391, 376-89, 330-51.)

After the 2003 test, nurse Raibley stated that plaintiff was diagnosed with "positive EBV chronic infection." (Id. at 383.) Interestingly, her treatment notes after the date of the diagnostic test do not mention EBV. (Tr. at 384-85.) The only other medical record after this test was given was that of Dr. Goyal in which he refers to the blood panel of that date,

1  summarizing it: "[t]his showed hepatitis C not detected, with virus load less than 0.90, which is
2  normal. There was another blood test report, which was essentially normal. This was dated
3  February 5, 2003. Hepatitis serology antigen was negative for B. Hepatitis C antibodies were
4  nonreactive. Hepatitis C was repeatedly reactive." (Id. at 395.)
5        EBV is in the herpes virus family and is one of the most common human viruses,
6  infecting most of the population sometime during their lives.
7  www.cdc.gov/ncidod/diseases/ebv.htm. In the United States, as much as 95 percent of the
8  population between ages 35 and 40 have been infected. In adolescence or young adulthood, it
9  will become infectious mononucleosis 35 to 50 percent of the time. (Id.) When it does, it will
10 usually last only four months. If it lasts more than six months, it is termed chronic EBV
11 infection, but valid laboratory evidence reflecting ongoing EBV infection is not usually found in
12 these patients.

> Finally, even when EBV antibody tests, such as the early antigen test, suggest that reactivated infection is present, this result does not necessarily indicate that a patient's current medical condition is caused by EBV infection. A number of healthy people with no symptoms have antibodies to the EBV early antigen for years after their initial EBV infection.
>
> Therefore, interpretation of laboratory results is somewhat complex and should be left to physicians who are familiar with EBV testing and who have access to the entire clinical picture of a person. To determine if EBV infection is associated with a current illness, consult with an experienced physician.

19 (Id.)
20       Plaintiff has failed to come forward with any records indicating any symptoms,
21 proper analysis, or treatment for EBV. For example, no experienced medical source interpreted
22 plaintiff's laboratory results. Plaintiff was not prescribed Acyclovir (an antiviral medication for
23 treating herpes, Epstein-Barr virus and cytomegalovirus) or any other medication for this virus.
24 The claimant bears the burden of proof at this stage of the sequential analysis. Bowen v.
25 Yuckert, 482 U.S. at 146, n. 5,107 S. Ct. 2287. Plaintiff has not met her burden to show the EBV
26 \\\\\

should have been considered in conjunction with her other impairments in determining her residual functional capacity.

Plaintiff's next contention is that the ALJ erred in rejecting Dr. Goyal's opinion that plaintiff could occasionally lift less than ten pounds, and found instead that plaintiff could lift up to ten pounds occasionally. The ALJ stated:

> While Dr. Goyal also advised that the claimant would be able to lift and carry less than ten pounds occasionally or frequently and would be able to only stand and walk for less than two hours in an eight hour day due to back and knee pain ..., the undersigned finds that Dr. Goyal's objective examination findings of normal muscle strength, normal gait and normal sensation is more in line with the ability to lift up to ten pounds occasionally and to stand and walk up to two hours in an eight hour day.

(Id. at 20-21.)

Contrary to plaintiff's assertion that the ALJ failed to cite any opinion or assessment that contradicted Dr. Goyal's opinion, the ALJ specifically stated that the objective signs found in the opinions of Drs. Grady, Otani and Goyal were all consistent with the residual functional capacity of sedentary work. (Id. at 22.) Therefore, the ALJ did not "overrule" Dr. Goyal's opinion. Dr. Otani found that plaintiff had no limitations in her upper extremities. (Tr. at 290.) It is true that Drs. Bellomo and Dann also found that plaintiff could lift and carry *less* than ten pounds occasionally.[9] (Tr. at 470, 329.) Whether plaintiff could lift ten pounds or only nine pounds is not significant. Therefore, any error by the ALJ in this regard was harmless. An error which has no effect on the ultimate decision is harmless. Curry v. Sullivan, 925 F.2d 1127, 1121 (9th Cir. 1990).

In regard to her last contention regarding her residual functional capacity, that the ALJ should have considered plaintiff's non-exertional limitations, mental impairments and fatigue from EBV, these impairments have been previously discounted. The ALJ's failure to

---

[9] In a residual functional capacity questionnaire concerning headaches, nurse Raibley stated that plaintiff could do no lifting, bending or stooping. (Tr. at 374.)

consider them was appropriate.

D. Whether the ALJ Erred in Rejecting the Opinion of treating sources Dr. Kusic and Nurse Practitioner Raibley

Plaintiff argues that the ALJ erred in rejecting the opinion of nurse practitioner Raibley because she was not an acceptable medical source.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[10] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to

---

[10] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

17

weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[11] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

The ALJ stated in regard to nurse practitioner Raibley:

> Moreover, the undersigned underscores that Ms. Raibley is a nurse practitioner and is therefore not an acceptable medical source as defined under appropriate rulings and regulations. Although Dr. Kusic signed off on Ms. Raibley's statement that the claimant was unable to perform any activity for gainful employment, the undersigned does not find sufficient evidence that Dr. Kusic has actually treated the claimant sufficiently to be considered her treating physician. The claimant also reported to Dr. Koulianos that although Dr. Kusic was her doctor, she was typically seen by Dr. Kusic's family nurse practitioner, Ms. Raibley ... Furthermore, even if the undersigned were to treat both Ms. Raibley and Dr. Kusic as acceptable medical treating sources, the undersigned finds that their opinions are nonetheless inconsistent with the scant objective evidence of record.

(Tr. at 21.) The ALJ then proceeded to discuss the objective findings in the record, and noted that Ms. Raibley based her opinion on plaintiff's subjective reports rather than her own observations. For example, Raibley found no limitation on spinal range of motion, motor strength or functioning, sensation, gait or reflexes, despite plaintiff's report of lumbar tenderness, and showing of muscle spasms and knee instability. The ALJ chose instead to rely on the objective signs found both in Raibley's records and the exams performed by Drs. Grady, Otani and Goyal. (Id. at 22.) The ALJ concluded that since Raibley's opinion did not coincide with the

\\\\\

---

[11] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

objective medical evidence, he gave less weight to her opinion regarding plaintiff's functional capacity. (Id.)

A nurse practitioner working as part of an interdisciplinary team with an acceptable medical source should be considered part of the opinion of that source. Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996). That case cites 20 C.F.R. § 416.913(a)(6) which states that a "report of an interdisciplinary team that contains the *evaluation and signature* of an acceptable medical source is also considered acceptable medical evidence." (emphasis added). Here, some of the chart notes contain only Raibley's signature, with no evidence that Dr. Kusic evaluated them or that Raibley consulted with him numerous times regarding plaintiff's condition as did the nurse practitioner in Gomez. (Tr. at 383-89.) Other notes, however, do contain Dr. Seely's signature. (Tr. at 310, 336, 338, 350, 296, 297, 305, 307, 308, 310-14.) Nevertheless, there is no evidence that Dr. Seely evaluated this patient or that Raibley consulted with him either. Furthermore, the ALJ specifically stated in the alternative, if Raibley were considered an acceptable medical source, he rejected her opinion in any event because it was inconsistent with the objective evidence in the record.

Here, the ALJ gave specific and legitimate reasons to reject the opinion of nurse practitioner Raibley in favor of the consulting physicians who performed thorough exams. It should be especially noted that Dr. Goyal conducted an extremely comprehensive review of the medical records in addition to a thorough exam. (Tr. at 394-400.)

Substantial evidence supports the ALJ's decision that plaintiff was not disabled.

\\\\\
\\\\\
\\\\\
\\\\\
\\\\\
\\\\\

1  <u>CONCLUSION</u>

2  ACCORDINGLY, plaintiff's Motion for Summary Judgment or Remand is

3  DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the

4  Clerk is directed to enter Judgment for the Commissioner.

5  DATED: 9/27/05

6  /s/ Gregory G. Hollows

7  GREGORY G. HOLLOWS
   U.S. MAGISTRATE JUDGE

8  GGH/076